**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

INTEGRATED BAR CODING SYSTEMS, CO.,

        Plaintiff,

v.

JOSEPH WEMERT, CYPOSOFT CORP.,
ORBESOFT, INC., and  INTEGRATED DATA
SOLUTIONS, INC.,

        Defendants.

CIVIL CASE NO. 04-60271
HON. MARIANNE O. BATTANI

_____/

**OPINION AND ORDER DENYING**
**THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

**I.      INTRODUCTION**

Before the Court are Defendants' and Plaintiff's motions for summary judgment (Doc.

##39 & 61).  Integrated Barcoding Systems, Co. ("IBS") sued Defendants for copyright

infringement, unfair competition, breach of contract, and misappropriation of trade secrets in

connection with the alleged copying of data collection software code.  All such allegations

revolve around the question of whether the OrbeSoft Software developed by Orbesoft Inc.,

infringes IBS's QuikTrac[1] Software.  Defendants seek summary judgment, contending that the

two software programs are not substantially similar.  IBS contends that summary judgment in its

favor is appropriate because there is evidence of direct, literal copying of its code.

_____

[1] QuikTrac, which is the name the copyright is registered under, is also known as
Cyposoft.

1

## II.    STATEMENT OF FACTS

IBS is a full service data collection solutions provider that develops software and selects hardware to meet the needs of its customers.  In 1999, IBS hired defendant Joseph Wemert as a software developer.  In 2002, the President of IBS, Andrew Jacobs, joined Wemert to form Cyposoft, Inc., in order to develop a new software program for commercial development.  Since its creation, Cyposoft Inc., has held the copyright to the QuikTrac software.  Jacobs and Wemert parted ways in less than amicable circumstances after Cyposoft went out business.  After they ceased doing business together, Wemert continued to posses the original source code to the QuikTrac software.  This led to a lawsuit in 2003, in which IBS sued Wemert to enforce its copyright interests.  The litigation resulted in a confidential settlement.  Per the terms of the agreement, Wemert agreed not to use, derive from, or distributed the CypoSoft source code, and agreed to return all copies of the code in his possession and to assign all copyrights for the QuikTrac source code to IBS.

Soon after the lawsuit was settled, Bruce Kennedy, president of Integrated Data Solutions Inc., ("IDSI"), formed OrbeSoft and hired Wemert to develop a program to compete with QuikTrac.  Before writing the software code, Wemert consulted with a patent attorney to ensure that he could legally write the code for a competing product.  Kennedy also insisted that Wemert sign an employment agreement that allowed IDSI to terminate Wemert if any software he assigns to OrbeSoft infringes upon, or is substantially similar to, any software owned by a third party.

Wemert successfully developed a product to compete with IBS, and IDSI began marketing and selling the OrbeSoft software.  IBS sued Defendants after learning that Wemert developed the competing product.  IBS contends the OrbeSoft program infringes upon its

2

copyrights, that Wemert breached the settlement agreement by using the QuikTrac source code to develop the OrbeSoft product, and that Defendants are liable for misappropriation of its trade secrets.

## III.    STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As the United States Supreme Court has ruled:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. See Hager v. Pike County Bd. of Educ., 286 F.3d 366, 370 (6th Cir. 2002). "[T]he burden on the moving party may be discharged by 'showing' - that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

Once the moving party carries that burden, the burden then shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. FED. R. CIV. P. 56(e); Chao v. Hall Holding Co., 285 F.3d 415, 424 (6th Cir. 2002). "The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." Anderson v. Liberty Lobby Inc.,

3

477 U.S. 242,  256 (1986).  The court must view the evidence in a light most favorable to the

nonmovant as well as draw all reasonable inferences in the nonmovant's favor.  See Hunt v.

Cromartie, 526 U.S. 541, 549 (1999); Sagan v. U.S., 342 F.3d 493, 497 (6th Cir. 2003).

"A fact is 'material' and precludes grant of summary judgment if proof of that fact would

have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or

defense asserted by the parties, and would necessarily affect [the] application of appropriate

principle[s] of law to the rights and obligations of the parties."  Kendall v. Hoover Co., 751 F.2d

171, 174 (6th Cir. 1984)(citation omitted)(quoting BLACK'S LAW DICTIONARY 881 (6th ed.

1979)).  To create a genuine issue of material fact, the nonmovant must do more than present

some evidence on a disputed issue.

> There is no issue for trial unless there is sufficient evidence favoring the
> nonmoving party for a jury to return a verdict for that party.  If the [nonmovant's]
> evidence is merely colorable, or is not significantly probative, summary judgment
> may be granted.

Anderson, 477 U.S. at 249-50.  "No genuine issue of material fact exists when the 'record taken

as a whole could not lead a rational trier of fact to find for the non-moving party.'"  Michigan

Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002)(quoting Matsushita

Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  However, the mere existence

of a scintilla of evidence in support of the non-movant is not sufficient; there must be sufficient

evidence upon which a jury could reasonably find for the non-movant.  Anderson, 477 U.S. at

252.

## IV.   ANALYSIS

### A.   IBS's Infringement Claim

#### 1.   The Framework for Infringement Analysis

4

"To establish copyright infringement, a plaintiff must show: '(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" Ellis v. Diffie, 177 F.3d 503, 506 (6th Cir.1999)(quoting Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991).  For a valid copyright to exist, the copyrighted material must be an original work of authorship.  17 U.S.C. § 102.  "Originality . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possess at least some minimal degree of creativity."  Feist, 499 U.S. at 345.  Thus, the first step is for the court to identify "which aspects of the artist's work, if any, are protectible by copyright."  Kohus v. Mariol, 328 F.3d 848, 855 (6th Cir. 2003).  "Consequently, before comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected."  Kohus, 328 F.3d at 853.  When determining what elements are not entitled to copyright protection, courts have employed the doctrines of merger and *scenes a faire*. Lexmark Int'l v. Static Control Components, 387 F.3d 522, 535 (6th Cir. 2004).

> Where the "expression is essential to the statement of the idea,". . . or where there is only one way or very few ways of expressing the idea, . . . the idea and expression are said to have "merged."  In these instances, copyright protection does not exist because granting protection to the expressive component of the work necessarily would extend protection to the work's uncopyrightable ideas as well. . . . .   For computer programs, "if the patentable process is embodied inextricably in the line-by-line instructions of the computer program, [ ] then the process merges with the expression and precludes copyright protection." . . . .

Id. (citations omitted).  Likewise, when external factors, such as efficiency, dictate or constrain the manner in which an author of a computer program may express an idea, the doctrine of *scenes a faire* mandates that those elements must also be excluded from infringement consideration.  Id., at 535-36.

5

> In the computer-software context, the doctrine means that the elements of a program dictated by practical realities- e.g., by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices - may not obtain protection.

Id.

When determining if these doctrines apply, the Court must "focus on whether the idea is capable of various modes of expression." Mason v. Montgomery Data Inc., 967 F.2d, 135, 138 (5th Cir. 1992)(quoted by Lexmark, 387 F.3d at 536). The question the Court must answer, "is not whether any alternatives theoretically exist; it is whether other options practically exist under the circumstances." Lexmark, 387 F.3d at 536. Thus, "[i]n order to characterize a choice between alleged programming alternatives as expressive, in short, the alternatives must be feasible within real-world constraints." Id. In other words, "[w]hen a work itself constitutes merely an idea, process or method of operation, or when any discernible expression is inseparable from the idea itself, or when external factors dictate the form of expression, copyright protection does not extend to the work." Id., at 538

Once the non-protectable elements have been filtered out, the trier of fact then determines whether any of the protectable elements "have been copied in substantial enough part to constitute infringement." Id. To do so, the plaintiff must show evidence of direct, literal copying of the original elements of the work, or raise an inference of infringement by establishing: "(1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." Ellis, 177 F.3d at 506.

When determining if substantial similarity exists, the Court should focus on the intended audience. Kohus, 328 F.3d at 857. "In cases where the target audience possesses specialized

6

expertise, . . . the specialist's perception of similarity may be much different from the lay observer's, and it is appropriate in such cases to consider similarity from the specialist's perspective." Id. "Expert testimony will usually be necessary to educate the trier of fact in those elements for which the specialist will look." Id. However, the Court "should be hesitant to find that the lay public is not the work's intended audience[,]" lest litigants should read adoption of the intended audience test as an open invitation to attempt to justify departure from the ordinary observer test by arguing that "a product's audience is sufficiently specialized" in every instance. Id. (quoting Dawson v. Hinshaw Music Inc., 905 F.2d 731, 736-37 (4th Cir. 1990).

In copyright infringement cases, "granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly," but "a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity." Wickham v. Knoxville Int'l Energy Exposition, Inc., 739 F.2d 1094, 1097 (6th Cir. 1984), Kohus, 328 F.3d at 853.

## 2.   Use of expert testimony

The first issue the Court must address is whether the intended audience of the product is the lay observer, or is more specialized.  In this case, the protected, creative work is the computer source code.  In general, the lay public does not possess knowledge of what constitutes creativity in the computer code writing industry, "which elements are standard, and which elements are dictated by efficiency or by external standards." Kohus, 328 F.3d at 858. Substantial similarity should be considered from the viewpoint of the intended audience, which in this case, are those with knowledge and expertise in computer programming.  Therefore, the

Court will rely on the experts' reports to determine if the OrbeSoft source code infringes the QuikTrac copyright.

### 3. Filtration

"[B]efore comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected." Kohus, 328 F.3d at 853. After a thorough review and analysis of the expert reports submitted by the parties, the Court concludes that a majority of the alleged copied files should be filtered from the infringement analysis because they are from public domain sources, dictated by practical realities, or because the expressions are common place in the industry. See Lexmark, 387 F.3d at 535-36. IBS's expert, Dr. Lumsdaine, identified ten sets of files as containing some degree of either literal copying or substantial similarity. The Court will briefly address the experts' analyses of each set of files to determine whether the identified files should be filtered from infringement analysis.

### a. "RectTrack" set of files

Defendants' expert, Dr. Jeffay, states that Microsoft created and copyrighted this body of code, which is part of the Microsoft Foundation Class ("MFC"), and is freely available to Windows developers. He also states that this body of code is widely used within the industry, and thus, any consideration of these files must be filtered out from consideration. Sept. 8, 2006, Decl. of Dr. Jeffay, at 5, para. 7. Dr. Jeffay further states that the implementation of these functions is constrained by external factors of interoperation with MFC, and thus, it must be filtered from analysis. Id., at 6, para. 9.

Dr. Lumsdaine, IBS's expert, admits that the CRectTrack class is derived from the MFC library, but counters that names, interface, "and implementation of a derived class *can* constitute

8

creative expression . . . ."  Suppl. Decl. of Lumsdaine, at 5, para. 24 (emphasis added).  Dr. Lumsdaine's supplemental affidavit, filed in response to Dr. Jeffay's report, does not refute the remaining assertions Dr. Jeffay makes regarding this set of files.  Thus, because it is uncontested that this set of files is widely used within the industry, and that the implementation of these functions is constrained by external factors, this set of files must be filtered from the infringement analysis.  See Lexmark, 387 F.3d at 535-36.

> b.    "EditItem" set of files

Dr. Jeffay states that, generally speaking, these files contain functions used for developing user-interaction dialog boxes, and as such, these functions represent extremely generic Windows code that can be found in virtually any Windows application.  He states that nearly identical versions of this code can be found in the public domain, and thus, cannot be considered original expression.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 7, para. 13.  Dr. Lumsdaine does not dispute that the files are generic Windows code that is in the public domain, and thus, this set of files will also be filtered out of the infringement determination.  See Kohus, 328 F.3d at 853.

> c.    "XmlGen" set of files

Dr. Lumsdaine finds that the "comments *hint* that the class *may have been* previously" identically named/ "theses comments *hint* that the class in the OrbeSoft source code at one time *may have had the same name* as the class in the QuikTrac source code, or that the former was *perhaps derived* from the latter."  July 26, 2006, Decl. of Dr. Lumsdaine, at 16, para. 48 (emphasis added).  He goes on to find that there are significant similarities in the implementations of several class member functions.  Id., at 18.

Dr. Jeffay counters by stating that, in general, when dealing with such simple and generic functions, there are but a limited number of ways to implement a function, and as such, the code is subject to filtration.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 12, para. 28.  Taken together, the experts' reports show that there is no direct, literal copying.  Moreover, Dr. Jeffay's assertion that the functions should be filtered because they are so simple and generic is unrefuted.  In other words, there are only ". . . very few ways of expressing the idea," and thus, the idea and expression . . . have 'merged.'"  Lexmark, 387 F.3d at 535.  Therefore, this set of files is filtered from the Court's infringement analysis.

d.        "KeyInfo" set of files

Dr. Lumsdaine identified twenty eight lines of identical code.  July 26, 2006, Decl. of Dr. Lumsdaine, at 19, para. 50.  He also notes that the lines of code are indented identically in both programs.  Id., at 13-14, para. 32.  However, according to Dr. Jeffay, the identical text is non-executable code that defines a set of names.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 13, para. 31.  He asserts that because the names in question correspond to the names of keys on the keyboard, the text is filterable because it is quite generic and there are only a limited number of ways that someone can, for example, name the function key F1.  Id.  Moreover, he states that most of these names derive directly from a set of similar names defined in the "winuser.h" file of definitions commonly used by Windows developers.  Id.

 "[T]arget industry practices, and standard computer programming practices - may not obtain protection.  . . . ."  Lexmark, 387 F.3d at 535.  See also Brown Bag Software v. Symantec Corp., 960 F.2d 1465, 1473 (9th Cir. 1992) (affirming district court's finding that "[p]laintiffs may not claim copyright protection of an . . . expression that is, if not standard, then

10

commonplace in the computer software industry")(quoted by <u>Lexmark</u>, 387 F.3d at 535-36).

Here, it is unrefuted that naming the keys in the manner done in both programs is a common

computer programming practice, and therefore, this set of files is filtered from infringement

analysis.

e.   "GenDefs" set of files

According to Dr. Lumsdaine, "[s]ome of the similarities that *might point to* copying

include[,]" the order of the files, types and names, and the sequence of included files. July 26,

2006, Decl. of Dr. Lumsdaine, at 19, para. 52. However, Dr. Jeffay opines that, viewed in

context, the fragments identified by Dr. Lumsdaine are quite different because the QuikTrac

code includes a file that is not present in the OrbeSoft code. Sept. 8, 2006, Decl. of Dr. Jeffay, at

14-15, para. 33-34. He goes on to state that the common files in the two codes are required for

the correct operation of each program, and  thus, they must be present; i.e., their presence is

dictated by external factors, and thus, filterable. <u>Id</u>., at 15, para. 35. Dr. Lumsdaine did not

refute Dr. Jeffay's assertions in his supplemental declaration. Given Dr. Jeffay's findings that

the files or the sequence of files are dictated by external factors, and the nature of Dr.

Lumsdaine's report, which lacks any determinative finding of copying, the Court will filter this

set of files from its infringement analysis. <u>See Lexmark</u>, 387 F.3d at 535-36.

f.   "CypoNtService" set of files

Dr. Lumsdaine found that the "EnumServices" function in this set of files showed

significant similarities. July 26, 2006, Decl. of Dr. Lumsdaine, at 21, para. 55. However,

according to Dr. Jeffay, the code in question comes from the public domain, specifically, a set of

classes for NT services called "CNTService," written and copyrighted by PJ Naughter and freely

available from a website.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 16-17, para. 36-39.  Because it is unrefuted that this code is derived from a public domain source, it will be filtered from the infringement analysis.  See Kohus, 328 F.3d at 853.

g.      "Tn5250Field" set of files

Dr. Lumsdaine cited the following as evidence of infringement in this set of files: Class names are similar; both sets of files have some of the same Member function names, with the word "signed" misspelled in both as "singed"; both sets of files contain some of the same names in the Member Data section; and, the implementation of several of the class member functions showed significant similarities.  July 26, 2006, Decl. of Dr. Lumsdaine, at 21, para. 57.

Dr. Jeffay states that the names in the OrbeSoft program come directly from IBM publications describing the function and operation of an IBM 5250 terminal.  He goes on to state that because the names are not original, creative expression, they are not protectable, and should be filtered out.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 18, para. 40-41.  He also states that the entire OrbeSoft 5250Field files are similar to implementations of the functions in the public domain and the operation of theses functions is dictated by external factors of having to emulate and interoperate with an IBM 5250 terminal.  Id., at 19, para. 43.

Dr. Jeffay's assertions that the code is in the public domain, is dictated by external factors, and that the names are too common to be considered creative expression is not rebutted. "[T]he elements of a program dictated by practical realities- e.g., by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices-may not obtain protection . . . ."  Lexmark, 387 F.3d at 535.  Therefore, because Dr.

12

Jeffay's assertions are not rebutted, the Court finds that this set of files/code is not protectable and will be filtered out because it is dictated by compatibility requirements and the naming is standard industry practice.

h.      "TelnetDefs" set of files

Dr. Lumsdaine identified fifteen identical lines of code in both programs in this set of fiels.  July 26, 2006, Decl. of Dr. Lumsdaine, at 23, para. 59.  However, Dr. Jeffay states that the matching lines of code come from public domain sources, or are commonly used names, which are too common to be considered original expression.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 19, para. 44, 47.  Because it is undisputed that the matching lines of code come from the public domain and that the naming conventions are standard industry practice, the Court will filter this file set from infringement consideration.

i.      "TnRecordReader" set of files

In his report, Dr. Lumsdaine identifies a significant number of identical member function names, three instances of one-to-one correspondence of member data, forty one lines of identical code in the member functions, and Wemert's initials on identical, nonstandard comment lines. July 26, 2006, Decl. of Dr. Lumsdaine, at 23-25.  He states that this is direct, literal copying of QuikTrac's code.  Dr. Jeffay states that the similarities in this file set are irrelevant because they are due to the fact that the file sets are derived from a third source, the tn5250 project, which is in the public domain.

Dr. Lumsdaine counters by stating that the OrbeSoft and QuikTrac codes are more similar to each other than they are to the public domain code, and thus, the QuikTrac code is entitled to copyright protection because it displays significant aspects of creative expression, not

13

dictated by external factors not found in the public domain code.  Id., at 28, para. 66.  As evidence, he cites the fact that there are fifteen methods in the in the QuikTrac code that do not have corresponding functions in the public domain code.  Id., at 27, para. 65.  Dr. Jeffay believes this is irrelevant because the public domain code has a copyright on derivative works, and forbids infringement suits based on another program's use of the tn5250 code.  As a result, he states that there is no basis to assert infringement for these similarities because use of the public domain code in the QuikTrac software forecloses IBS from bringing an infringement suit against others based on the use of the derivative code.  Sept. 8, 2006, Decl. of Dr. Jeffay, at 20-22, para. 48, 51.

However, it is Dr. Lumsdaine's opinion that neither the QuikTrac nor OrbeSoft files were directly derived from the identified third source.  Suppl. Decl. of Lumsdaine, at 9, para. 39.  He believes that, to the extent that the public domain code may have been used as some kind of original basis for the QuikTrac or OrbeSoft codes, the differences that appear between the two codes are so large that the QuikTrac or OrbeSoft codes must be considered original works.  Id.

Because Dr. Lumsdaine opines that the QuikTrac or OrbeSoft codes should be considered original works, there is a difference of opinion between the experts whether the QuikTrac code can be considered a derivative of the public domain code.  Therefore, there is a question of fact whether Defendants copied a portion of the QuikTrac code that is entitled to protection as a separate work from the public domain code, or if the OrbeSoft code is merely a non-infringing derivative of the public domain code.

j.      "TnRecordSender" set of files

Again, Dr. Lumsdaine identified a significant number of identical code lines and similarities between the two sets of files.  However, there is also a disagreement whether this portion of the OrbeSoft code is derived from the same public domain 5250 Telnet implementation referenced earlier.  Therefore, there is a question of fact whether these set of files are sufficiently different from the public domain code, or whether they are merely derivatives of code in the public domain.

### 4.    Direct Copying or Substantial Similarity

Once the non-protectable elements have been filtered out, the trier of fact then determines whether any of the protectable elements "have been copied in substantial enough part to constitute infringement."  Id.  To do so, the plaintiff must show evidence of direct, literal copying of the original elements of the work, or raise an inference of infringement by establishing: "(1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue."  Ellis, 177 F.3d at 506.  Given the disagreement in the expert reports over two sets of files, there is a question of fact whether there is actionable direct, literal copying in the OrbeSoft code.  Therefore, the Court must deny both parties' motions for summary judgment on this claim.

### 5.    Screen Shots

IBS also alleges that it is entitled to a copyright in the visual elements that are displayed on a computer screen.  Defendants assert that, as presented to the Court, the allegedly infringing screen shots are illegible, and thus, there is no basis to find infringement.  In its motion, IBS notes that Defendants' screen shots are obstructed by additional windows, hampering any comparison.  Given the quality and black and white fidelity of the provided screen shots, and

15

inability to undertake an unobstructed analysis of the parties' respective screen shots, there remains a genuine issue of material fact whether the two rival screen shots are substantially similar. Therefore, summary judgment for either party is improper.

### B.    Federal Preemption

In a supplemental brief filed well after the Court heard oral argument on the parties' motions for summary judgment, Defendants asserted that Plaintiff's state law claims for unfair competition, breach of contract, and misappropriation of trade secrets are preempted by federal copyright law. IBS argues that Defendants failure to raise preemption as an affirmative defense in their answers to the complaint constitutes a waiver of that defense.

"Generally, the question of federal preemption is relevant only as a defense . . . ." 29A FED. PROC., L. ED. § 69:17 (2006). See also Rivet v. Regions Bank of La., 522 U.S. 470, 476, (1998)("[F]ederal preemption is ordinarily a defense . . . ."), 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV.3d § 1271 (2006). A number of courts have held the same. Saks v. Franklin Covey Co., 316 F.3d 337 (2d Cir. 2003)(ERISA preemption), Brannan v. United Student Aid Funds, Inc., 94 F.3d 1260 (9th Cir. 1996)(Fair Debt Collection Act preemption), Wolf v. Reliance Standard Life Ins. Co., 71 F.3d 444 (1st Cir. 1995) (ERISA preemption), Jordan v. Clayton Brokerage Co. of St. Louis, Inc., 975 F.2d 539, 541 (8th Cir. 1992) (Commodity Exchange Act preemption), DIRECTV, Inc. v. Barrett, 311 F.Supp. 2d 1143, 1147 (D.C. Kan. 2004)("The court holds here that preemption is an 'avoidance or affirmative defense' that must be pleaded pursuant to Fed. R. Civ. P. Rule 8(c)."), Williams v. Ashland Eng'g Co., 863 F.Supp. 46 (D.C. Mass. 1994), Kenepp v. Am. Edwards Labs., 859 F.Supp. 809 (D.C. Pa. 1994), Kennan v. Dow Chem. Co., 717 F.Supp. 799 (D.C. Fla. 1989), In re Air Crash

16

Disaster at Stapleton Int'l Airport, Denver, Colorado, on November 15, 1987, 721 F.Supp. 1185 (D.C. Colo. 1988).

Defendants did not assert federal preemption as an affirmative defense in their answers to Plaintiff's complaint.  "Generally, a failure to plead an affirmative defense, like statute of limitations, results in the waiver of that defense and its exclusion from the case."  Phelps v. McClellan, 30 F.3d 658, 663 (6th Cir. 1994).  Defendants have not cited, nor has the Court found, any case law holding that federal copyright law preemption is jurisdictional, and therefore, is a defense that cannot be waived.  As a result, Defendants' have waived the ability to raise preemption as a defense to Plaintiff's state law claims.

### C.      IBS's Breach of Contract Claim

Per the terms of a settlement agreement, Wemert agreed not to use, derive from, or distributed the CypoSoft source code.  Wemert also agreed to return all copies of the code in his possession, and assign all copyrights for the QuikTrac source code to IBS.  IBS alleges that Wemert violated the settlement agreement by retaining a copying of the QuikTrac code and using it to write the OrbeSoft program.

To recover for breach of contract under Michigan law, a plaintiff must prove: 1) the existence of a contract, 2) the terms of the contract, 3) that the defendant breached the contract, and 4) that the breach caused the plaintiff injury.  Webster v. Edward D. Jones & Co., 197 F.3d 815, 819 (6th Cir. 1999).

IBS asserts that based on Dr. Lumsdaine's findings, there is no genuine issue of material fact that Wemert used the QuikTrac code to write the OrbeSoft program.  Dr. Lumsdaine found evidence that the QuikTrac code was used to write the OrbeSoft code in an archival database, the

Source Code Management Database ("SCM").[2]  The similarities he identified include: one file in both programs that shows strong similarities; 119 lines of verbatim lines of code in the "HostTelnet" set of files; 199 lines of code that are almost identical; various other strong indicators that the codes are copies; and, a very similar statement in both the QuikTrac and OrbeSoft codes that has no meaning in the OrbeSoft code and was commented out in the OrbeSoft code.[3]  July 26, 2006, Decl. of Dr. Lumsdaine, at 32-33.  In addition, he also found 109 lines of code contained the word "Cypo"or a CypoSoft copyright statement in the OrbeSoft code. Id., at 33, 35.

Dr. Lumsdaine found many instances of identical lines of code between the two programs.  However, if those identical lines of code are not protectable, i.e., in the public domain, common industry practice, or owned by a third party, then the presence of identical lines of code is insufficient to establish that Wemert used the proprietary QuikTrac source code to produce the OrbeSoft code.  Both Wemert and Kennedy testified that OrbeSoft Inc., purchased libraries of code from third-parties.  See e.g., Dep. of Wemert, at 88, Dep. of Kennedy, at 52.  Moreover, Wemert testified that third-party code libraries and code in the public domain were the only outside sources he used to write the OrbeSoft program.  Dep. of Wemert, at 88.  In deciding a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence."  Harris v. City of Akron, 20 F.3d 1396, 1403 (6th Cir. 1994).  As such,

---

[2] The SCM stores earlier versions of source code as a program is developed.

[3] When a line of code is "commented out," it remains in the code, but is no longer an operational part of the program.

there is a dispute whether any identical lines of code originate from Wemert's copying of the QuikTrac code or from public domain or purchased third-party sources.

Next, Wemert's use of the "Cyposoft" name cannot be considered evidence that he used the QuikTrac code to develop the OrbeSoft program. Wemert retained the right to use the CypoSoft name, as is evident by the presence of CypoSoft Corp. as a defendant in this suit. Thus, it is entirely reasonable to find the word "Cypo" in Wemert's work, and therefore, cannot be considered evidence that Wemert breached the settlement agreement.

IBS also suggests Wemert's conduct is proof that he used the QuikTrac code to develop the OrbeSoft code. In one instance, IBS notes that two days after it mailed a copy of the instant lawsuit to Wemert, the revision history to the OrbeSoft files containing the CypoSoft copyright were altered with a "fix copyright text" command. This is certainly evidence of a guilty mind, assuming that he received the summons and complaint on that day. However, because Wemert had the legal right to use the CypoSoft name, Wemert's act of changing the copyright notice from CypoSoft to OrbeSoft, the employer he assigned the OrbeSoft code to, is not a basis for granting summary judgment for IBS on this claim.

The next instance of conduct that allegedly establishes liability is Wemert's failure to save revisions of the OrbeSoft code in a database until June 2004. As a consequence, the entire first year of the OrbeSoft source code development was never recorded. Wemert testified that it was unnecessary to use such a database because he was the only person working on the code at that time. He explained that, because he was the sole programmer, he could simply save his revisions in a single file without affecting other programmers' work. Dep. of Wemert, at 180-83. Thus, there is a question of fact Wemert did not archive earlier versions of the OrbeSoft program

19

because he did not need to, or because there were no earlier versions because he used the

QuikTrac code as a starting point for the OrbeSoft program.

>    **D.**    **IBS's Misappropriation of Trade Secret Claim**

>    IBS alleges that Defendants misappropriated its trade secret by using the QuikTrac code

to develop the OrbeSoft program.  IBS further alleges that IDSI and Wemert knew that the

QuikTrac source code was a trade secret, and that any use of the QuikTrac source code would be

tortious.  IBS contends that because the OrbeSoft code infringes the QuikTrac code, and because

there is other evidence that the OrbeSoft code was derived from the QuikTrac code, the Court

should grant summary judgment in its favor.

> (b) "Misappropriation" means either of the following:
>
> (i) Acquisition of a trade secret of another by a person who knows or has reason
> to know that the trade secret was acquired by improper means.
>
> (ii) Disclosure or use of a trade secret of another without express or implied
> consent by a person who did 1 or more of the following:
>
> (A) Used improper means to acquire knowledge of the trade secret.
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her
> knowledge of the trade secret was derived from or through a person who had
> utilized improper means to acquire it, acquired under circumstances giving rise to
> a duty to maintain its secrecy or limit its use, or derived from or through a person
> who owed a duty to the person to maintain its secrecy or limit its use.
>
> (C) Before a material change of his or her position, knew or had reason to know
> that it was a trade secret and that knowledge of it had been acquired by accident
> or mistake.
>            . . . .
>
> (d) "Trade secret" means information, including a formula, pattern, compilation,
> program, device, method, technique, or process, that is both of the following:

(i) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(ii) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

MICH. COMP. LAWS ANN. § 445.1902

IBS has presented sufficient evidence to establish that the QuikTrac code is a trade secret, and that Wemert was aware that IBS retained ownership rights to the QuikTrac code.[4] However, it has not shown that there is no material question of fact that Defendants misappropriated the QuikTrac source code.

Bruce Kennedy is the president of both OrbeSoft and IDSI. He knew of the prior intellectual property suit and animosity between IBS and Wemert. Based on these facts, IBS asserts that IDSI and OrbeSoft Inc. are liable for misappropriation as a matter of law. IBS has presented no other evidence that IDSI and OrbeSoft Inc. knew, or had reason to know, that IBS's trade secret was acquired by improper means; i.e., that Wemert used the QuikTrac code to write the OrbeSoft code. Further, in an attempt to avoid litigation, OrbeSoft Inc./IDSI made Wemert sign an employment agreement that allowed OrbeSoft to terminate him if he produces code that infringes, or is substantially similar to, any software owned by a third party.

Moreover, when Wemert assigned OrbeSoft Inc. the source code for the OrbeSoft program in November 2003, he warranted in writing that the code did not infringe on, and was not substantially similar to, any other software including QuikTrac. Thus, there is substantial

---

[4] Evidence of this knowledge includes that fact that Wemert signed an employee handbook to this effect, and that he signed the settlement agreement, which acknowledged the same.

21

evidence to suggest that OrbeSoft and IDSI did not know Wemert allegedly misappropriated the QuikTrac code because they made him attest to that fact in writing twice. In addition, because there is a question of fact whether Wemert copied the QuikTrac code to write the OrbeSoft program, there is a question of fact whether Wemert improperly acquired and disclosed IBS's trade secret. Therefore, summary judgment for either party is inappropriate.

## V.      CONCLUSION

Accordingly, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment is **DENIED. IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment is **DENIED.**

**IT IS SO ORDERED.**


s/Marianne O. Battani
MARIANNE O. BATTANI
UNITED STATES DISTRICT JUDGE


DATED: February 12, 2007


## CERTIFICATE OF SERVICE

Copies of this Order were served upon counsel of record on this date by ordinary mail and/or electronically via the Court's ECF System.

s/Bernadette M. Thebolt
DEPUTY CLERK

22